IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2008 FEB 15   AM 11: 28

LORETTA G. WHYTE
CLERK

WILLIE GARY, on behalf of              :
himself and all others similarly situated :
                                       :
    and                                :
                                       :
KEVIN HACKER, on behalf of             :      COMPLAINT CLASS ACTION
himself and all others similarly situated :      JURY DEMAND
                                       :
    and                                :
                                       :
PETER TROUT, on behalf of              :
himself and all others similarly situated :       08-1002
                                       :
    and                                :       SECT. B MAG. 2
                                       :
MARCUS MILLER, on behalf of            :
himself and all others similarly situated :
                                       :
vs.                                 :  :
                                       :
NEW ENGLAND PATRIOTS                   :
Serve: Robert Kraft                    :
    One Patriot Place                  :
    Foxborough, MA 02108               :
                                       :
    and                                :
                                       :
NEW ENGLAND PATRIOTS                   :
LIMITED PARTNERSHIP                    :
Serve: Corporation Service Company     :
    84 State Street                    :
    Boston, MA 02109                   :
                                       :
    and                                :
                                       :
BILL BELICHICK                         :
116 Meadowbrook Road                   :
Weston, MA 02493                       :

Plaintiffs, by and through counsel, and for all others similarly situated, and for their

1

Fee $350
Process
X  Dktd
   CtRmDep
   Doc. No.

Dockets.Justia.com

Complaint against the Defendants, state as follows:

## PRELIMINARY STATEMENT
## OF THE CASE

1.    This case is brought by four Plaintiffs: a former St. Louis Rams employee/player,

two purchasers of a ticket to the 2002 Super Bowl XXXVI, who also attended the

game on February 3, 2002 and an owner of two seats licenses with the St. Louis

Rams for the 2001 season. All of this was for the 2001-2002 season. The

Plaintiffs bring the claims on behalf of all others similarly situated. The case is

brought against National Football League ("NFL") team, the New England

Patriots ("Patriots"), the limited partnership which is believed to own the Patriots

team, and Bill Belichick ("Belichick"), the head football coach of the team. The

basis of this action is that the Defendants fraudulently videotaped the St. Louis

Rams ("Rams") "walk through" prior to the 2002 Super Bowl for the purpose of

gaining an unfair advantage in the game.

## JURISDICTION AND VENUE

2.    This Court has subject matter jurisdiction over the federal claims, pursuant to 28

U.S.C. § 1331 and § 1332; 18 U.S.C. § 1961. There are federal questions and

diversity jurisdiction.

3.    Plaintiffs allege Defendants had contacts with this district generally and, in

particular, with the events herein alleged. Defendants are subject to the exercise

of jurisdiction of this Court over the Defendants and venue is proper in this

judicial district pursuant to 28 U.S.C. § 1391. The proper venue for this is in New

Orleans because the acts complained of occurred in New Orleans.

2

4.      Plaintiffs and Defendants, based upon the alleged facts, engaged in transactions in the jurisdictions.

5.      The amount in controversy exceeds $75,000.

6.      Willie Gary was an employee of the NFL Football Team, the St. Louis Rams, and was on the Super Bowl XXXVI Team Roster for the 2002 Super Bowl. He now lives in the Atlanta, Georgia area.

7.      Kevin Hacker purchased a ticket and attended the 2002 Super Bowl. His office is in Cincinnati, Ohio.

8.      Kevin Hacker's seat was in Section 330 Row 15 Seat 14 for the 2002 Super Bowl.

9.      Peter Trout is a resident of St. Charles, Missouri, and is a Rams fan who was the owner of two seat licenses with the St. Louis Rams for 2001 season and all seasons thereafter. He acquired his seat license for the 1995 season, the first season after the Rams moved to St. Louis. He has only missed three games to date since the Rams moved to St. Louis. His seat locations are Section 151, Row QQ, Seats 13 and 14. When originally purchased, the seat license fee was $1,000 per seat.

10.      Marcus Miller is a resident of Collinsville, Illinois is a Rams fan who purchased a Super Bowl XXXVI ticket and attended the game. His seat location at the Super Bowl was Section 634, Row 30, Seat 20.

11.      Defendant New England Patriots are headquartered at One Patriot Place, Foxborough, Massachusetts 02035.

12.      Defendant Bill Belichick resides at 116 Meadowbrook Road, Weston,

3

Massachusetts 02493.

13.   Defendant New England Patriots Limited Partnership is headquartered at One

      Patriot Place, Foxborough, Massachusetts 02035.

14.   Super Bowl XXXVI was played on February 3, 2002 at the Louisiana Superdome,

      located in New Orleans, Louisiana.  72,922 fans attended the game.

15.   The New England Patriots defeated the St. Louis Rams 20 to 17 on a last-second

      field goal as time expired.

16.   Matt Walsh is a former employee of the New England Patriots who performed

      videotaping duties for the team.  He worked for the New England Patriots during

      the 2002 Super Bowl time period.

17.   As first reported on the news website ESPN.com, the NFL began looking into

      claims a New England Patriots employee was videotaping signals by New York

      Jets coaches on New York's sideline during the season opener game played on

      September 9, 2007.

18.   ESPN.com reported that NFL security confiscated a video camera and tape from a

      Patriots employee during New England Patriot's 38-14 victory over the Jets that

      day.  The employee was accused of aiming his camera at the Jets' defensive

      coaches, who were sending signals out to the players, sources told ESPN.

19.   The New England Patriots denied that they had violated NFL rules.

20.   This was not the first time Defendants had been accused of cheating.  In

      November 2006, the Green Bay Packers professional football team found a man

      wearing a Patriots staff credential carrying a video camera on the sidelines at

Lambeau Field, the Packers' home field. Teams are allowed to have a limited number of their own videographers on the sideline during the game, but they must have a credential that authorizes them to shoot video and wear a yellow vest. But Packers spokesman Jeff Blumb said the person in question didn't have the right credential and wasn't wearing a yellow vest, so Packers security asked him to put away the camera. He was escorted out of the stadium.

21.     After the videotape of the New York Jets game was confiscated on September 9, 2007, Patriots coach Bill Belichick apologized, saying: "Although it remains a league matter, I want to apologize to everyone who has been affected, most of all ownership, staff and players." He refused to take questions from reporters about the NFL investigation. However, he stormed out of a weekly press conference with reporters on September 12, 2007.

22.     On September 13, 2007, the NFL found the Defendants guilty of violating all applicable NFL rules by engaging in a surreptitious videotape program. The New England Patriots coach, Bill Belichick, was fined $500,000 and the Patriots were ordered to pay $250,000 for stealing an opponent's defensive signals. NFL Commissioner Roger Goodell also ordered the Patriots to give up next year's first-round draft choice if they reached the playoffs and second and third-round picks if it didn't. "This episode represents a calculated and deliberate attempt to avoid longstanding rules designed to encourage fair play and promote honest competition on the playing field," Goodell said in a letter to the Patriots. The Commissioner specifically imposed penalties on the Defendant Patriots

organization because "Coach Belichick not only serves as the head coach but also has substantial control over all aspects of New England's football operations. His actions and decisions are properly attributed to the club." Patriots' owner Robert Kraft refused to comment. The New York Jets issued a statement saying: "We support the commissioner and his findings."

23.    The specific NFL rule violated by Defendants states: "no video recording devices of any kind are permitted to be in use in the coaches' booth, on the field, or in the locker room during the game." The rules also specifically state that all video for coaching purposes must be shot from locations "enclosed on all sides with a roof overhead." That was re-emphasized in a memo sent September 6 to NFL head coaches and general managers. In it, Ray Anderson, the NFL's executive vice president of football operations wrote: "Videotaping of any type, including but not limited to taping of an opponent's offensive or defensive signals, is prohibited on the sidelines, in the coaches' booth, in the locker room, or at any other locations accessible to club staff members during the game."

24.    Belichick appeared to accept full responsibility, stating on September 13, 2007: "Once again, I apologize to the Kraft family and every person directly or indirectly associated with the New England Patriots for the embarrassment, distraction and penalty my mistake caused. I also apologize to Patriots fans and would like to thank them for their support during the past few days and throughout my career." But then, bizarrely, he attempted to deny responsibility, stating: "We have never used sideline video to obtain a competitive advantage

6

while the game was in progress . . . With tonight's resolution, I will not be offering any further comments on this matter. We are moving on with our preparations for Sunday's game."

25.    An unidentified source, but one the <u>Boston Herald</u> relied upon enough to publicize the allegation, told the <u>Boston Herald</u> a member of the Patriots video staff taped the St. Louis Rams last "walk-through" before they played in the 2002 Super Bowl.

26.    The <u>Boston Herald</u> cited a source close to the Patriots in the 2001 season as saying the team held a "walk-through" at the Superdome in New Orleans before the game on February 3, 2002.

27.    After the Patriots took a team picture, a member of their video department stayed inside the stadium and taped the Rams "walk-through."

28.    The Rams were two touchdown favorites but lost on Adam Vinatieri's last-second field goal.

29.    Roger Goodell has publicly stated these allegations involving the 2002 Super Bowl were not investigated, and also publicly stated there was no evidence of any wrongdoing. On February 13, 2008, Roger Goodell met with U.S. Senator Ailen Specter, Senior Republican on the Senate Judiciary Committee. Sen. Specter stated publicly that Goodell reported Belichick had been taping opponents defensive signals since 2000. Goodell, according to Specter, said Belichick told him he believe the taping was legal. Goodell said he did not concur.

30.    Roger Goodell destroyed the notes and videotapes linked to the "Spygate"

stemming from the Jets game. This is the focus of a current Congressional inquiry led by U.S. Senator Arlen Specter.

31. According to Mike Fish of ESPN.com, "Matt Walsh, a former Patriots video assistant who has suggested he has information potentially embarrassing to the team and the league."

32. "Really, it is nothing that I care to go on the record about or talk about," Walsh recently told ESPN.com.

33. According to the Rams itinerary from the Super Bowl XXXVI, the team took the Superdome turf at 12:45 p.m. Saturday, February 2, 2002, for its final practice, which came after the Patriots had completed their "walk-through."

34. The Rams were scheduled to take a team picture at 1:30 p.m., eat a box lunch at the stadium at 2:00 p.m., and catch buses back to the team hotel at 2:15 p.m.

35. Kurt Warner, quarterback for the Rams in the 2002 Super Bowl, says he remembers little from the "walk-through," other than that the offense ran some of its red zone plays.

36. The Rams had seven plays inside the Patriots' 30-yard line in the final quarter of the 2002 Super Bowl. At one point, the Patriots stopped the Rams on four successive plays inside the 3-yard line.

37. Warner explained his suspicions about the Patriots surfaced only after they were caught cheating this past September.

38. "At the same time, I think everybody wonders to what extent did they [illegally tape opponents]? Was this something that was just done on game day, or was it

8

something they did throughout the week? [Did] they go to practice facilities? And I think that is the question," Kurt Warner stated publicly.

39.    Kurt Warner suggests the New England Patriots would tape opponents' defensive signals from the sidelines, as it was caught doing against the Jets this season, to decode the communications and file them away for a future game against the same team. If the coaches know the defensive signals, he says, they can filter information to the quarterback through the headset in his helmet, which shuts off with 15 seconds left on the play clock.

40.    Another former Patriots quarterback, who spoke to ESPN.com on condition of anonymity, says that the New England Patriots pushes the envelope further than most teams and that the Patriots were doing so long before they were caught in September, 2007. Warner says he has no insight into the Patriots' methods, although it is a "huge advantage."

40.    As Warner paints the picture, Super Bowl XXXVI wasn't like any other loss. It derailed a franchise and damaged careers and reputations.

"After we lost the Super Bowl, the organization went into a little bit of a downward spiral, as you see with a lot of teams that lose the Super Bowl. You see how career situations were altered after losing that game. You look at Mike Martz. If he is a Super Bowl winner, that is a whole different thing. Or just maybe guys, that were their only chance to be in a Super Bowl. And to go away losing it instead of winning it, that is a huge deal."

41.    During a "walk-through," an opposing team could videotape not only plays but

also coaches signals.

42.    The <u>Boston Herald</u> reported the cameraman for the "walk-through" was never
asked to produce a news media credential.

43.    Matt Walsh has publicly stated he knows more than has been made public: "If I
ever got brought in for a deposition or something, then I would just face the whole
gauntlet of questions.  There would be things I'd be forced to answer that some
people haven't taken responsibility for."

44.    Plaintiffs attempted to contact Matt Walsh through his employer's location
without success. Plaintiffs want to take his deposition.

45.    Matt Walsh worked for the Patriots from 1996 until the winter of 2002.

46.    Regarding the NFL investigation, Matt Walsh stated: "If they're doing a thorough
investigation, they didn't contact me."

47.    Walsh maintained that a very limited number of people within the organization
were privy to details about the team's video practices, notably video director
Jimmy Dee and Ernie Adams, Defendant Belichick's prep school friend and right-
hand man.

48.    In regards to Ernie Adams, Walsh stated: "You've got a better chance of him
telling you who killed JFK than anything about New England.  There are lots of
stories there.  He told me stories of things they used to do in Cleveland."

49.    Walsh refused to provide evidence of potential wrongdoing unless ESPN agreed
to pay his legal fees related to his involvement in the story, as well as an
indemnification agreement that would cover any damages found against him in

court. ESPN denied his requests.

50.    Walsh maintains he would use potential evidence: "I'd use it if they came after me.

51.    When news broke about the 2002 Super Bowl taping prior to the 2008 Super Bowl, the New York Giants, prior to the 2008 Super Bowl, moved their "walk-through" to an undisclosed location.

52.    Each member of the St. Louis Rams 2002 Super Bowl Roster and staff should be compensated for the monetary damages they suffered by losing out on the receipt of (a) the winning bonus (For Super Bowl XXXVI, the winning bonus was $58,000 vs. $33,000 for the loser. This is a $25,000 difference per player.) (b) a Super Bowl winner's ring (a ring from Super Bowl XXXVI is on eBay for $125,000), endorsements, and other consequential economic losses. For 45 players, the difference in bonuses and the value of the rings alone would be $6,750,000. These damages would also be applicable to the coaching staff of the Rams, as well as each owner of a St. Louis seat license who owned the license for the 2001 and 2002 season.

53.    It is the contention of Plaintiffs that but for the videotaping, known and unknown at this time, and based upon the results of the game by a field goal margin, the outcome of the game would have been different. Expert witnesses will testify on this issue.

54.    Each ticket attendee of the game (72,922 in attendance) paid millions of dollars to watch a supposedly honest competitive game. At a face value of $400 per ticket,

11

these damages total $29,168,800. However, many purchased tickets at inflated prices. This action seeks restitution for the ticket's face value costs.

55.     The ticket purchasers and attendees of the game were damaged by watching and paying for a game tainted by the Defendants' illegal activities.

56.     All Rams' employees were damaged by having played in a Super Bowl game tainted by the Defendant's illegal activity and by the loss of the game also caused by the Defendants' illegal activity.

57.     All claims pled herein were tolled since Defendants intentionally concealed their acts and both Plaintiffs and the class members were unable to learn of the illegal acts until recent published reports.

58.     The Defendants conspired with each other to interfere with and breach the contractual relationships.

59.     The purpose of the NFL rules is to recognize that sports regulation is to preserve participant parity and competitive equivalency.

61.     The NFL, the New England Patriots, and St. Louis Rams agreed to rules and conduct for the very purpose of preserving the integrity and marketing of the NFL, its teams and its games.

62.     Cheating in professional sports must not be tolerated to protect the sanctity of the game. Steroid use in baseball, gambling on sports and "Spygate" all raise related issues.

## CLASS ACTION ALLEGATIONS

63.     Pursuant to Federal Rules of Civil Procedure, Rule 23 (a) and (b), Plaintiffs bring

this action on behalf of themselves and three classes of similarly situated persons

defined as:

    A.    All those who purchased tickets and/or attended the 2002 Super

    Bowl.

    B.    All St. Louis Ram employees on the 2002 Super Bowl team.

    C.    Owners of St. Louis Rams seat licenses for the 2001-2002 season.

64.    The three classes seek certification of claims for damages pursuant to the claims

set out herein. The claims apply to all classes.

65.    This action is brought as a class action and may properly be so maintained

pursuant to the provisions of the Federal Rules of Civil Procedure, Rule 23.

Plaintiffs reserve the right to modify and add to the class based on the results of

discovery.

66.    **Numerosity:** Members of the classes are so numerous that their individual joinder

is impracticable. The precise phone numbers and addresses of members of the

classes are unknown to the Plaintiffs. Plaintiffs estimate that the one class

consists of approximately 72,922 members, one class consists of the St. Louis

Rams employees in 2002 and the other class, all owners of the St. Louis Rams

seat licenses.

67.    There is a well-defined community of interest in the questions of law and fact

involved affecting the members of the classes. These common legal and factual

questions include: (a) Whether Defendants can be held accountable under the

claims herein; (b) Whether Plaintiff members of the classes are entitled to

13

damages; (c) Whether Plaintiffs and class members are entitled to recover

compensatory, statutory and punitive damages; and (d) Whether Plaintiffs and

class members are entitled to an award of reasonable attorneys' fees, pre-

judgment interest, and costs of this suit.

68.     **Typicality**: Plaintiffs' claims are typical of the claims of the members of the three

classes because two Plaintiffs (Hacker and Miller) were ticket purchasers and

attended the game and one Plaintiff (Gary) was a St. Louis Rams player and

employee; and one Plaintiff (Trout) was an owner of a St. Louis seat license and

all members of the classes have similarly suffered harm arising from Defendants'

violations of law, as alleged herein.

69.     **Adequacy:** Plaintiffs are adequate representatives of the classes because their

interests do not conflict with the interests of the members of the classes they seek

to represent.  Plaintiffs have retained counsel competent to pursue these claims

and intend to prosecute this action vigorously.  Plaintiffs and their counsel will

fairly and adequately protect the interests of the classes.

70.     **Predominance and Superiority:** This suit may also be maintained as a class

action under Federal Rules of Civil Procedure, Rule 23(b)(3) because questions of

law and fact common to the two classes predominate over the questions affecting

only individuals members of the classes and a class action is superior to other

available means for the fair and efficient adjudication of this dispute.  The

damages suffered by each individual class member may be relatively small,

especially given the burden and expense of individual prosecution of the complex

and extensive litigation necessitated by Defendants' conduct. Furthermore, it would be virtually impossible for the class members, on an individual basis, to obtain effective redress for the wrongs done to them. Moreover, even if class members themselves could afford such individual litigation, the court system could not. Individual litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties and the court system presented by the complex legal issue of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

<u>COUNT I</u>
**TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS**

71.    Plaintiffs repeat and incorporate herein by reference the allegations in the preceding paragraphs of this Complaint, as they set forth fully herein.

72.    Plaintiffs and members of all classes had a contract with the St. Louis Rams and NFL under which the class of ticket-holders purchased the right to attend and observe the 2002 Super Bowl, a class is constituted of employees of the St. Louis Rams and a class is all the owners of the seat licenses of the St. Louis Rams. The St. Louis Rams, by contract and obligation with the NFL, were required to play in the 2002 Super Bowl.

73.    Plaintiffs and members of all classes held the understanding, both express and implied, that the 2002 Super Bowl would be played honestly and according to

15

established rules and conditions that were known in advance by the St. Louis Rams, the New England Patriots, and the NFL.

74.    The understanding that the 2002 Super Bowl would be played honestly and according to the agreed rules and conditions was a material condition of the contracts, rights, and obligations of the Plaintiffs and the three classes.

75.    Defendants' intentionally and knowingly interfered with the contractual right and expectation to an honest game played according to the agreed rules and conditions by fraudulently recording the St. Louis Rams Super Bowl "walk-through." Defendants did so for their own private benefit by seeking to gain a fraudulent advantage over the St. Louis Rams in the game.

76.    Accordingly, Defendants tortuously interfered with the contracts, rights, obligations and relationship between the Plaintiffs and members of the classes and the St. Louis Rams and NFL.  Therefore, Defendants are liable to Plaintiffs and the members of the three classes for restitution of the ticket price for the 2002 Super Bowl with interest, attorneys' fees, and cost of suit and all damages specified in paragraphs 52 and 54 including the compensatory damages.

## COUNT II
## COMMON LAW FRAUD.

77.    Plaintiffs repeat and incorporate herein by reference the allegations in the preceding paragraphs of this Complaint, as if set forth fully herein.

78.    Plaintiffs and members of all classes contracted with the St. Louis Rams and/or the NFL to attend and/or participate in the 2002 Super Bowl.

16

79.    Individuals purchased tickets to said games, players participated in the game and owners of seat licenses held those licenses under the express and implied conditions that the game was to be played honestly and according to agreed rules and conditions.

80.    Defendants individually and in concert violated this expectation and understanding by fraudulently recording the St. Louis Rams Super Bowl "walk-through," a direct violation of the agreed rules and conditions.  In fact, Roger Goodell, the Commissioner, acknowledges the filing as a violation.

81.    The ticket-holders, players, employees and owners of seat licenses including Plaintiffs and members of all classes, are the direct beneficiaries, i.e., third party beneficiaries, of the contract between the Defendants and the St. Louis Rams and/or the NFL.

82.    Defendants intended to violate the agreed rules and conditions with knowing intent.

83.    Defendants concealed and failed to disclose their intent to fraudulently record and capture the St. Louis Rams "walk-through," an act that violated the agreed rules and conditions of the game contract.

84.    It is a material condition to the purchase of tickets, participation in the game by Plaintiffs, purchaser of seat licenses and members of all classes that the participants in the game will play honestly and according to the agreed rules and conditions.

85.    Defendants concealed their intent to violate this material understanding.

86.    Defendants committed the violation of the rule by stealth and surreptitious conduct by recording and capturing the St. Louis Rams "walk-through."

87.    Plaintiffs and members of all classes relied to their detriment in purchasing tickets to the 2002 Super Bowl, participating in the game as players and purchasing a seat license.

88.    Plaintiffs and members of all classes were damaged as a result.

89.    It is a material and agreed fact, understanding and condition that the NFL games are to be played honestly and to be a match of contestants following the same essential rules and conditions. Plaintiffs and, upon information and belief, members of the ticket class, would not have purchased tickets to the games if the Defendants had disclosed that they intended to commit a fraud and in violation of an essential and material game rule. The class of players would not have agreed to play in a tainted game. The owners of the seat licenses would not have purchased same.

90.    Accordingly, Defendants are liable in fraud to Plaintiffs and all classes for all damages spelled out in paragraphs 52 and 54 and punitive damages, interest, attorney's fees and costs of suit.

91.    Defendants intentionally and knowingly acted to violate the game rules and knew or should have known that such rules are material to the honest performance of the game contract.

92.    Defendants conspired to violate the game rules and did so by stealth and deception and have been previously caught committing similar acts.

18

93.    Defendants misrepresented and suppressed the truth with the intention to obtain an unjust advantage for themselves to cause great harm to Plaintiffs and all classes.

94.    Such violation corrupted the sport of football.  Accordingly, Plaintiff and the three classes respectfully seek punitive damages be assessed against Defendants, along with interest, attorneys fees and costs of suit.

## COUNT III
## THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATION ACT, 18 U.S.C., 1961(a), (b), (c), (d)

95.    Plaintiffs repeat and incorporate herein by reference the allegations in the preceding paragraphs of this Complaint, as they set forth fully herein.

96.    Defendants, by their above described acts, engaged in a pattern of racketeering activity through the performance of at least two acts of racketeering within a ten year period through the use of the mails and/or the interstate wires as a material element of their scheme to defraud the 2002 Super Bowl ticket holders and the St. Louis Rams football players.  It's clear that Defendants participated in videotaping for years.  In fact, public reports on ESPN on February 12, 2008 include Bill Belichick having admitted to Roger Goodell he had videotaped opponents for years.  To arrange and perform these practices, Defendants used phones, cell phones, computers, emails and the mail to communicate and carry out their scheme.

97.    Under Civil Rico, Plaintiffs and the three classes were injured by the Defendants operation and management of the enterprise through a pattern of racketeering.

98.    Plaintiffs and the three classes have been injured by the reason of the Defendants

investment of the proceeds of the racketeering activity.

99.    Defendant Belichick was employed by and associated with Defendant Patriots.

The Defendant Patriots, through NFL marketing, playing away games and fan

base across states, are engaged in interstate commerce.  Defendant Belichick, has

Head Coach, operated and managed the enterprise of the Patriots and the

fraudulent taping through a pattern of racketeering activity injuring Plaintiffs and

members of the class.

100.    The fraudulent videotaping is an illegitimate enterprise.

101.    The Defendants and other employees, unknown at this time were in "association-

in-fact."

102.    One of the purposes of the enterprise was to earn money in several ways,

including, winning a bonus for winning the Super Bowl, a championship ring;

increased salaries; bonuses; and increasing the value of the franchise.

103.    Defendant Belichick supervised the enterprise.

104.    Section 1964(c) states any person injured in his business or property by reason of

a violation of section 1962 of this Chapter may sue therefore in any appropriate

United States district court and shall recover threefold the damages he sustains

and the cost of the suit, including reasonable attorney fees.

105.    Another motivation of the enterprise was the glory of winning the Super Bowl.

106.    There was a pattern because there was continuity of the enterprise.

107.    This claim accrued and the statute of limitation only began to run when it was

20

discovered by the recent publicity.

108.    Defendants received income derived, directly or indirectly, from a pattern of
racketeering activity to use or invest or used, directly or indirectly, any part of
such income, or the proceeds of such income, in acquisition of any interest in, or
the establishment or operation of, any enterprise which is engaged in, or the
activities of which affect, interstate or foreign commerce in violation of 18 U.S.C.
1962(a).

109.    Defendants through a pattern of racketeering activity acquired or maintained,
directly or indirectly, an interest in or control of an enterprise which is engaged in,
or the activities of which affect, interstate or foreign commerce in violation of 18
U.S.C. 1962(b).

110.    Defendants employed themselves or others in, or were, associated with an
enterprise engaged in, or the activities of which affect, interstate or foreign
commerce, to conduct or participate, directly or indirectly, in the conduct of such
enterprise's affairs through a pattern of racketeering activity in violation of 18
U.S.C. 1962(c).

111.    Defendants conspired to violate subsections (a), (b), or (c) of 18 U.S.C.1962, as
described in 18 U.S.C. 1962(d).

112.    The above-described enterprises consisted of (a) the New England Patriots
football organization, (b) the National Football League and (c) the St. Louis Rams
football organization (d) Bill Belichick .

113.    Defendants, by the above described acts, committed predicate acts through the use

21

of the mails or interstate wires in furthering their fraudulent inducement of consumers of Super Bowl 2002 tickets to purchase said tickets by concealing their intent to violate the agreed rules and conditions of the Defendants' game contracts with the St. Louis Rams and/or the NFL and concealed and omitted to disclose to the ticket-holders their intent to subvert and corrupt the 2002 Super Bowl by fraudulently recording and capturing the "walk-through" prior to the 2002 Super Bowl causing damage to Plaintiffs in all classes. In addition, the same equally applies to the St. Louis Rams employees in 2002.

114.    Accordingly, Defendants are liable to Plaintiffs and other class members for damages under paragraphs 52 and 54, along with treble damages, interest, attorney's fees and costs of suit.

## COUNT IV
## VIOLATION OF RIGHTS
## AS THIRD PARTY BENEFICIARIES

115.    Plaintiffs repeat and incorporate herein by reference the allegations in the preceding paragraphs of this Complaint, as if set forth fully herein.

116.    Plaintiffs and all class members were intended third party beneficiaries of the contracts between the St. Louis Rams and/or the New England Patriots and/or the NFL.

117.    The understanding that the 2002 Super Bowl was to be played honestly and according to the agreed rules and conditions is a material condition of the Patriots' contract with the St. Louis Rams and/or the NFL and the Plaintiffs and all class members were the intended third party beneficiaries of said contracts.

22

118.    Defendants violated and interfered with the third party benefit to the Plaintiffs and all class members by fraudulently recording and capturing the St. Louis Rams "walk-through."

119.    Accordingly, Defendants are liable to Plaintiffs and members of all classes as third party beneficiaries of the New England Patriots' contract with the St. Louis Rams and/or the NFL for all damages under paragraphs 52 and 54.

## COUNT V
## CONTRACT

120.    Plaintiffs repeat and incorporate herein by reference the allegations in the preceding paragraphs of this Complaint, as if set forth fully herein.

121.    Plaintiffs plead they have an implied or quasi contract with the New England Patriots who violated such contract by fraudulently recording and capturing the St. Louis Rams "walk-through."

122.    Accordingly, Defendants are liable to Plaintiffs and members of both classes as third party beneficiaries of the Patriots' contract with the St. Louis Rams and/or the NFL for damages under paragraphs 52 and 54.

## COUNT VI
## LOUISIANA UNFAIR TRADE PRACTICES
## AND CONSUMER PROTECTION ACT

123.    Plaintiffs repeat and incorporate herein by reference the allegations in the preceding paragraphs of this Complaint, as if set forth fully herein.

124.    Louisiana Revised Statute 51:1405(A) provides: Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.

23

125.    Defendants conduct was unfair and offended established public policy and said conduct was unethical, oppressive, unscrupulous and substantially injurious.

126.    Louisiana Revised Statute 51:1409, § 1405 gives Plaintiffs and class members a private cause of action under this section and all damages under same include all damages under paragraphs 52 and 54.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs for themselves and all other similarly situated respectfully request that the Court:

A.    Certify the three classes.

B.    Declare that Defendants' actions support all claims and Counts herein.

C.    Award equitable relief pursuant to all claims and Courts herein as to the Plaintiffs and all classes;

D.    Award statutory damages to the extent permitted by law to each Plaintiffs and class members in the sum of:

   (i)    actual damages sustained by the Plaintiffs and all classes (paragraphs 52 and 54).

   (ii)   treble damages pursuant to The Racketeer Influenced and Corrupt Organization Act. 18 U.S.C. § 1961 et.seq.

E.    Award punitive damages to the extent permitted by law to each Plaintiff and all class members.

F.    Award to Plaintiffs attorneys' fees and other costs of suit to the extent permitted

24

by law.

G.      Grant such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs hereby request a jury trial for all issues triable by jury including, but not limited

to, those issues and claims set forth in any amended complaint or consolidated action.

Respectfully submitted,

Eric C. Deters (TA)
5247 Madison Pike
Independence, Kentucky 41051
(859) 363-1900 - telephone
(859) 363-1444 - facsimile
Co-Counsel For Plaintiffs Pro Hac Vice To Be Filed

and

Hugh K. Campbell, Jr.
2011 Madison Road
Cincinnati, Ohio 45202
(513) 762-5126 - telephone
(513) 762-5125 - facsimile
Co-Counsel for Plaintiffs Pro Hac Vice To Be Filed

and


John L. Young (LA#2199)
915 St. Louis Street
New Orleans, LA 70112
(504) 581-2200 - telephone
(504) 581-5100 - facsimile
 Local Counsel For Plaintiffs